Hon. Karen A. Overstreet

# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| CANYON PARK SEE STORE, INC., a Washington corporation, and AKBARALI "SAM" SAMANANI, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>LAKHA INVESTMENT CO., LLC, a Washington limited liability company, AMIN S. ("ANDY") LAKHA, an individual, EMERALD CITY CONSTRUCTION, INC., a Washington corporation, KEYBANK OF WASHINGTON, d/b/a KEYBANK NATIONAL ASSOCIATION, a Washington corporation, JOHN DOE CORPORATION, the corporate identity or assignee of the rights and liabilities of Keybank National Association, if any, relevant to this action, and ARCO PRODUCTS COMPANY, a Delaware corporation,<br><br>Defendants. | Bankruptcy Case No. 02-21702<br><br>Adversary Proceeding No.<br><br>VERIFIED COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES |

## COMPLAINT

COME NOW the Plaintiffs, Canyon Park See Store, Inc. and Akbarali "Sam" Samanani, by and through the undersigned counsel, and do hereby make the following Complaint against the Defendants:

COMPLAINT- 1

Law Offices of
**ROMERO MONTAGUE P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA 98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

# I. JURISDICTION AND PARTIES

1.1. This Court has jurisdiction pursuant to 28 U.S.C.A. §157 as the facts alleged herein set forth a core proceeding.

1.2. Plaintiff Canyon Park See Store, Inc. ("CPSS") is a Washington corporation and is the debtor in the above-encaptioned bankruptcy proceeding under Chapter 11 of the United States Bankruptcy Code.

1.3. Plaintiff Akbarali "Sam" Samanani ("Samanani") is the principal shareholder of Canyon Park See Store, Inc. As will be more fully alleged below, Samanani and CPSS are the victims of a fraud by the defendants Lakha Investment Co., LLC, Emerald City Construction Co., Inc. and Andy Lakha ("the Lakha Defendants") designed to use Samanani and CPSS as "fronts" for a scheme to obtain excessive financing for the construction and opening of a gas station, convenience store, and car wash in Canyon Park ("the Canyon Park Station"), which financing was siphoned by the defendants for their own uses and profits, leaving CPSS and Samanani destitute, unable to service debt, and bankrupt.

1.4. Defendant Lakha Investment Co., LLC ("LIC") is a Washington limited liability company that claims principal ownership of the shares of CPSS and/or the exclusive right to exercise the voting power of the shares. As will be more fully alleged below, LIC and/or its principal owner, defendant Amin S. Lakha, made misrepresentations of fact to Samanani and others relating to the value of the land and anticipated business income that would be generated by the Canyon Park Station for the purpose of obtaining financing from defendant KeyBank National Association ("KeyBank"). The debt owed by CPSS to KeyBank is the largest single debt owed by CPSS. As will be more fully alleged below, the funds disbursed by KeyBank for the alleged benefit of CPSS were in reality appropriated by LIC, Lakha, and/or defendant Emerald City Construction, Inc., a Washington corporation owned and/or controlled by Lakha, for their own uses and benefits, leaving CPSS without sufficient working capital and with unsustainable debt.

1.5. Defendant Emerald City Construction Co., Inc. ("Emerald City") is, on information and belief, a Washington corporation wholly owned and/or controlled by

COMPLAINT- 2

Lakha that bid and built the Canyon Park Station. As will be more fully alleged below, Emerald City, presumably at Lakha's behest, prepared a fraudulent and grossly inflated cost schedule for construction of the Canyon Park Station and submitted and accepted payment for grossly inflated construction charges. Emerald City also failed to adequately construct the Canyon Park Station's facilities, which among other things led to severe access problems that have impacted CPSS's ability to generate revenues from the Canyon Park Station.

1.6. Defendant Amin S. "Andy" Lakha ("Lakha") is, on information and belief, the controlling shareholder of LIC and Emerald City and a director and officer of both companies. Lakha acted for himself and directed the fraudulent actions of LIC and Emerald City that are more fully alleged herein. He therefore has personal liability for the actions of LIC and Emerald City alleged herein.

1.7. Defendant Key Bank of Washington d/b/a KeyBank National Association ("KeyBank") is a Washington banking and/or lending institution. KeyBank is the lender that provided the financing for the land purchase and facilities construction for the Canyon Park Station. Keybank is a secured creditor of CPSS and holds personal guarantees from Lakha and Samanani relating to the amounts financed. KeyBank is currently threatening foreclosure and is expected to seek relief from stay to complete the foreclosure. As will be more fully alleged below, KeyBank failed to diligently investigate the true costs of construction and the estimated earnings potential of the Canyon Park Station proffered by the Lakha Defendants. Had KeyBank exercised due diligence rather than accepting the representations of the Lakha Defendants at face value, it would have never extended the degree of financing that it did. KeyBank's own recently commissioned appraisal, conducted in anticipation of a foreclosure sale, demonstrates that the appraisal materials presented by the Lakha Defendants were not "market oriented."

1.8. Defendant John Doe Corporation ("JDC") is a fictitious corporation. On information and belief or in alternative pleading, JDC is the true corporate identity of KeyBank National Association and/or is the assignee of the rights and liabilities of KeyBank National Association with respect to the CPSS transaction.

1.9. Defendant Arco Products Company ("ARCO") is a Delaware corporation doing business in Washington State. ARCO is a major creditor of CPSS. ARCO's claims against CPSS arise out of advances it made for pumps and other facilities at the Canyon Park Station. As will be more fully alleged below, ARCO provided, or caused to be provided, defective equipment and software, specifically the cash acceptors known as PIC machines, that despite repeated efforts by CPSS to obtain assistance and correction from ARCO and its required vendors, never functioned properly. These defective PIC machines caused CPSS to suffer hundreds of thousands of dollars in lost revenues and required CPSS to abandon its relationship with ARCO and to "re-brand" to Chevron at a cost of approximately $100,000.

## II. COMMON FACTS

2.1. CPSS and Samanani re-allege the preceding allegations of the Complaint.

2.2. In 1999, Samanani was introduced to Lakha by a mutual acquaintance, Abdul Lalani ("Lalani") for a possible business relationship. Lakha presented himself as the "King of C-Stores (gas station convenience stores) in Washington." Indeed, Lakha has made a fortune over the years developing, constructing, owning and managing gas station convenience stores. Lakha proposed a business plan to Samanani whereby Samanani and Lalani would purchase various gas station C-stores developed by Lakha's companies at a "loan to value price," meaning that Samanani's and Lalani's investment would be approximately $100,000 per project to cover inventory and soft costs such as environmental reports and broker commissions.

2.3. Initially, Samanani and Lalani paid $100,000 into escrow for Lakha's account and began operating a gas station C-store in Marysville, Washington. The original plan was for Samanani and Lalani to also operate gas station C-stores in the Ballinger neighborhood and the planned Canyon Park Station, for which Samanani also paid another $100,000 deposit. After commencing business in Marysville, Samanani discovered that the projections Lakha offered to induce him into agreeing to buy the Marysville C-store were exaggerated. Samanani requested the return of his money and

COMPLAINT- 4

Law Offices of
**ROMERO MONTAGUE P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA 98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

cancellation of the deals, but Lakha refused and threatened to keep all of the money Samanani had paid into escrow because of Samanani's alleged "breach."

2.4. Knowing that his initial investment was at risk, Samanani bowed to pressure from Lakha and agreed to allow Lakha and Lalani to use him as the nominal owner in order to obtain financing for the Canyon Park Station. Lalani or his attorneys then formed Canyon Park See Store, Inc. and Lalani served as the primary manager of the business until late 2001, when Samanani took over to try and save the business. In addition to the pressure Lakha applied, he also provided Samanani with appraisal documentation that grossly inflated the value of the raw land on which the Canyon Park Station would be built and the income potential for the business. Lakha was also the owner of the raw land on which the Canyon Park Station would be built and had allegedly purchased that land for $1.2 million, a price that KeyBank's own recent appraisal calls "not market oriented." On information and belief, Lakha's prior "purchase" of this land for $1.2 million, if indeed it was actually made, was the result of unrelated business pressures and was not an arms' length transaction. The appraisal commissioned by Lakha declared that the raw land had a value of more than $1.5 million, an appraisal upon which KeyBank subsequently relied in providing financing ostensibly for the Canyon Park Station. In reality, the land has a value of less and $1 million.

2.5. At Lakha's behest, Emerald City provided a cost schedule for construction of the Canyon Park Station of more than $1.7 million plus an additional $200,000 for "soft costs" such as engineering, permitting and other miscellaneous costs. That figure, and the alleged Marshall Valuation Service estimates utilized by Lakha's appraiser were grossly exaggerated. In fact, KeyBank's recent appraisal indicates that the true Marshall Valuation Service estimate for construction is a mere $620,000. Lakha presented these fraudulently inflated estimates to Samanani and KeyBank, both of whom relied upon these estimates. Lakha neither requested nor obtained any competitive bids for the construction of the Canyon Park Station.

2.6. Lakha also presented Samanani and KeyBank with an inflated appraisal of the anticipated revenues the Canyon Park Station would likely produce. On the whole,

COMPLAINT- 5

the Lakha-commissioned appraisals and analyses proposed a total fee simple value for the Canyon Park Station of almost $4 million prior to "stabilized operations" and $4.3 million "after stabilization."

2.7. Samanani relied on all of Lakha's fraudulent misrepresentations in agreeing to become the nominal shareholder of CPSS and in the hope that he would eventually recoup the original investment he had made with Lakha. In agreeing to become a personal guarantor on the loan from KeyBank, which KeyBank required, Samanani also relied on Lakha's agreement to also be a personal guarantor.

2.8 KeyBank relied on Lakha's fraudulent misrepresentations in agreeing to extend financing for the Canyon Park Station, in the form of a land purchase and construction loan of more than $2.7 million. On information and belief, KeyBank did not perform a reasonable due diligence on the true value of the land or the revenue potential from the Canyon Park Station and instead relied solely on the appraisals commissioned and proposed by Lakha. In any event, Samanani and CPSS were the ultimate victims of Lakha's fraud and/or KeyBank's negligence.

2.9. As part of the construction and business ramp-up, CPSS, at Lakha's urging and with Lakha's assistance, secured additional financing of approximately $400,000 from Defendant ARCO as part of a "branding" arrangement and franchise agreement ("the Franchise Agreement") for the Canyon Park Station. On information and belief, Lakha is a former franchisee of ARCO. As part of that Franchise Agreement, ARCO provided so-called PIC machines and related software and hardware, that would allow customers to pay at the pump without direct intervention from store personnel. In reality, the PIC machines never operated properly and provided inaccurate and completely unreliable accounting numbers. In addition, the computer system connected to the PIC machines repeatedly stopped working, causing delays and lost revenues. Despite repeated complaints to ARCO and its vendors and reasonable efforts to secure corrections to the machines and software, the PIC machines continued to present unmitigable problems. The defective PIC machines and software cost the business tens of thousands, if not hundreds of thousands of dollars in revenues, which caused the

Canyon Park Station to default on the debt to ARCO, which in turn resulted in ARCO revoking the Franchise Agreement.

2.10. As part of a comprehensive series of agreements between Samanani, Lakha, and LIC designed to secure Samanani's participation in the efforts to secure financing for the Canyon Park Station, LIC provided $250,000 in cash to CPSS. That money was intended to bolster CPSS' financial statement and to serve as working capital once the Canyon Park Station was up and running. In exchange for that financing, Samanani and CPSS signed a Stock Pledge and Option Agreement ("the Stock Pledge Agreement") with LIC under which, among other things, Samanani pledged the shares of CPSS to LIC and gave the voting rights of those shares to LIC as security for the "loan." Although the Stock Pledge Agreement, drafted by Lakha's attorneys, purports to declare that the loan and Lakha's personal guarantee on the KeyBank loan were provided at Samanani's and CPSS' request, the entire scheme was in fact designed and promoted by Lakha.

2.11. Immediately after the KeyBank loan was approved and monies were disbursed to Lakha, Lakha required CPSS to pay out almost the entire $250,000 to Emerald City ($219,900) for a construction down-payment and to ARCO ($30,000) for a franchise fee. Samanani understood that these funds would be refunded to CPSS once construction draws were paid by KeyBank. Samanani understood also that the ARCO funds would also be applied to CPSS's account for working capital. In fact, despite the fact that Keybank and ARCO paid out all of the funds approved for the construction, those funds were all kept by Emerald City and never refunded to CPSS.

2.12. Despite the fact that the $250,000 was never refunded to CPSS, LIC has asserted that Samanani and CPSS are in default on the Stock Pledge Agreement and further assert ownership of and/or control of voting rights of the stock of CPSS. Conversely, CPSS and Samanani contend that, since the Lakha Defendants never refunded the $250,000, LIC has been paid in full on the Stock Pledge Agreement and that any rights LIC may have once had under the Stock Pledge Agreement no longer exist. In addition, the Lakha defendants now owe CPSS more than $85,000.

COMPLAINT- 7

## FIRST CAUSE OF ACTION – DECLARATORY JUDGMENT ACTION

3.1. CPSS and Samanani re-allege the preceding allegations of the Complaint.

3.2. There currently exists an actual controversy between Samanani and LIC and/or Lakha as to the ownership of and/or right to vote the shares of CPSS. This dispute is a core issue for the bankruptcy proceeding because Samanani proposes reorganization under Chapter 11 while Lakha and LIC oppose reorganization.

3.3. Determination of this controversy requires the Court to determine additional legal questions such as whether Lakha and/or LIC have received payment under the Stock Pledge and Option Agreement and/or whether Samanani may be relieved of any obligations to LIC and/or Lakha under that agreement because of the Lakha Defendants' fraudulent conduct.

3.4. This Court can and should determine, under the Declaratory Judgment Act, 28 U.S.C. §§2201, 2202, that Samanani is the rightful owner of the stock of CPSS and that he has the sole authority to decide whether CPSS should pursue reorganization under Chapter 11.

## SECOND CAUSE OF ACTION – FRAUDULENT MISREPRESENTATION

4.1. CPSS and Samanani re-allege the preceding allegations of the Complaint.

4.2. In order to induce Samanani into assuming ownership of CPSS and to act as personal guarantor of the KeyBank note, the Lakha Defendants, for themselves and each other, intentionally and/or negligently created or caused to create false and misleading appraisals of the value of the raw land on which the gas station, convenience store and car wash would be built and of the income potential of the business once constructed and opened, as described above. The Lakha Defendants further created or caused to create false, misleading, and exorbitant schedules of construction costs and to receive monies for exorbitant construction claims, as described above. The Lakha Defendants also used these inflated appraisals and cost estimates to secure financing from KeyBank as described above.

4.3. Samanani and CPSS reasonably relied on these misrepresentations to their detriment because they became riddled with unsustainable debt while the Lakha

Defendants siphoned off the moneys that should have gone to CPSS or that should have never been loaned in the first place. As a result of the misrepresentations, Samanani and CPSS have been damaged in an amount to be proved at trial, but in no event less than $1 million.

4.4. These claims are core to the bankruptcy proceeding because the ability of CPSS to successfully maintain a plan of reorganization under Chapter 11 depends in part on the recovery of damages from the Lakha Defendants.

## THIRD CAUSE OF ACTION – NEGLIGENT LENDING

5.1 CPSS and Samanani re-allege the preceding allegations of the Complaint.

5.2. Defendant KeyBank negligently failed to conduct a reasonable due diligence prior to financing the Canyon Park Station. On information and belief, KeyBank's judgment may have been impaired by its previously cozy relationship with the Lakha Defendants and/or other factors yet to be discovered. On information and belief, KeyBank relied upon and/or failed to adequately question the false and misleading appraisal information offered by the Lakha Defendants. If KeyBank had conducted a reasonable due diligence, it would not have loaned nearly as much money to CPSS, which in turn would have required the Lakha defendants to accept market oriented payments for the raw land sale and the construction. A lower loan amount would have enabled CPSS to obtain permanent financing to pay off the KeyBank loan, which would have prevented the necessity of the bankruptcy proceeding.

5.3. As a result of KeyBank's negligence, CPSS and Samanani have been damaged in an amount to be proved at trial but not less than $1 million. This claim is core to the bankruptcy proceeding because the ability of CPSS to successfully maintain a plan of reorganization under Chapter 11 depends in part on the recovery of damages from KeyBank and/or reduction in the debt owed to KeyBank.

Law Offices of
**ROMERO MONTAGUE P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA 98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

## FOURTH CAUSE OF ACTION – BREACH OF CONTRACT

6.1. CPSS and Samanani re-allege the preceding allegations of the Complaint.

6.2. ARCO breached the Franchise Agreement by requiring CPSS to use vendors who provided inadequate and defective PIC machines and software and by failing to properly repair, service and maintain the PIC machines despite repeated notice of the defects. ARCO further breached the Franchise Agreement by failing to stand in for the vendors and to guarantee the vendor's failure to warrant their products and services. ARCO's breach has caused substantial damages to CPSS in the form of lost revenues and resulting loan interest, late payment, and default charges as well as the cost of conversion and re-branding to Chevron. The amount of the damages caused by ARCO's breach will be proven at trial but is, in no event, less than $400,000.

6.3 The claim against ARCO is core to the bankruptcy proceeding because the ability of CPSS to successfully maintain a plan of reorganization under Chapter 11 depends in part on the recovery of damages from ARCO and/or reduction in the debt owed to ARCO.

## PRAYER FOR RELIEF

Having fully set forth their claims, CPSS and Samanani respectfully request the following relief:

1. A declaratory judgment that Samanani is the sole owner of the stock of CPSS, has the full voting rights of those shares, and is authorized to cause CPSS to seek bankruptcy protection;
2. An award of damages and/or reduction in debt, jointly and severally, against the Lakha Defendants, KeyBank, and ARCO.
3. Such other relief as the Court may deem just and reasonable.

Law Offices of
**ROMERO MONTAGUE P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA 98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

DATED this 30th day of September 2002.

ROMERO MONTAGUE P.S.

/s/ Eric Zimbelman
Eric Zimbelman, WSBA #22088
Attorneys for Plaintiff Akbarali
"Sam" Samanani

CBG LAW GROUP, PLLC

/s/ Darrel Carter
Darrel B. Carter, WSBA # 20318
Attorneys for Plaintiff Canyon Park See Store, Inc.

## **VERIFICATION**

I, Akbarali "Sam" Samanani, declare under penalty of perjury under the laws of the State of Washington and the United States of America that I am a plaintiff named in the foregoing Complaint and the sole shareholder of plaintiff Canyon Park See Store, Inc. I have read and understood the allegations and claims asserted therein and believe them to be true to the best of my knowledge.

DATED this 30th day of September 2002

/s/ Akbarali Samanani
Akbarali "Sam" Samanani

COMPLAINT- 11